08CV4468　Case: 1:08-cv-04468 Document #: 1-2  Filed: 08/07/08 Page 1 of 19 PageID #:7
JUDGE NORGLE
MAGISTRATE JUDGE NOLAN

AEE

# Exhibit A

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process Transmittal**
07/23/2008
CT Log Number 513666580

**TO:** Are Traasdahl, President
Thumbplay, Inc.
599 Broadway,, Floor 8
New York, NY 10012

**RE:** Process Served in Delaware

**FOR:** ThumbPlay, Inc. (Domestic State: DE)

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

| | |
|---|---|
| **TITLE OF ACTION:** | Nikolay Antonov, individually and on behalf of a class of similarly situated individuals, Pltf. vs. Thumbplay, Inc., etc., Dft. |
| **DOCUMENT(S) SERVED:** | Summons, Cover Sheet, Complaint, Jury Demand |
| **COURT/AGENCY:** | Cook County Circuit Court, IL<br>Case # 08CH26229 |
| **NATURE OF ACTION:** | Class Action - Seeking to stop defendant's unlawful practice of charging cellular telephone customers for prodcts and services the customers have not authorized, a practice which has resulted in defendant unlawfully collecting money from consumers |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 07/23/2008 at 14:00 |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service of this summons, not counting the day of service |
| **ATTORNEY(S) / SENDER(S):** | Myles McGuire<br>KamberEdelson, LLC<br>53 West Jackson Blvd.<br>Suite 550<br>Chicago, IL 60604<br>312-589-6370 |
| **ACTION ITEMS:** | SDP Papers with Transmittal, via Fed Ex 2 Day, 790057432334 |
| **SIGNED:** | The Corporation Trust Company |
| **PER:** | Scott LaScala |
| **ADDRESS:** | 1209 Orange Street<br>Wilmington, DE 19801 |
| **TELEPHONE:** | 302-658-7581 |

Page 1 of 1 / JH

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

| 2120 - Served | 2121 - Served | |
|---|---|---|
| 2220 - Not Served | 2221 - Not Served | |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| SUMMONS | ALIAS - SUMMONS | CCG N001-10M-1-07-05 ( ) |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

(Name all parties)

Nikolay Antonov

v.

Thumbplay, Inc.

No. 08CH26229

## SUMMONS

**To each Defendant:**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room _____, Chicago, Illinois 60602

☐ District 2 - Skokie
5600 Old Orchard Rd.
Skokie, IL 60077

☐ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

☐ District 4 - Maywood
1500 Maybrook Ave.
Maywood, IL 60153

☐ District 5 - Bridgeview
10220 S. 76th Ave.
Bridgeview, IL 60455

☐ District 6 - Markham
16501 S. Kedzie Pkwy.
Markham, IL 60426

☐ Child Support
28 North Clark St., Room 200
Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

**To the officer:**

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 44146
Name: Myles McGuire
Atty. for: Plaintiff
Address: 53 West Jackson Boulevard, Ste. 1530
City/State/Zip: Chicago, Illinois 60604
Telephone: (312) 589-6370
Service by Facsimile Transmission will be accepted at: _____
(Area Code) (Facsimile Telephone Number)

WITNESS, JUL 21 2008

DOROTHY BROWN
CLERK OF CIRCUIT COURT

Clerk of Court

Date of service: _____,
(To be inserted by officer on copy left with defendant or other person)

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

(Rev. 12/4/00) CCCH 0623

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT /CHANCERY DIVISION

Nikolay Antonov
           Plaintiff
v.

Thumbplay, Inc.
           Defendant

Case No. 08CH26229

## CHANCERY DIVISION CIVIL COVER SHEET

  A Chancery Division Civil Cover Sheet shall be filed with the initial complaint in all actions filed in the Chancery Division. The information contained herein is for Administrative purposes only and shall not be introduced into evidence. Please check the box in front of the appropriate category which best characterizes your action being filed.

| Code | | Category |
|---|---|---|
| 005 | ___ | Administrative Review |
| 006 | ___ | Change of Name |
| 001 | ✓ | Class Action |
| 002 | ___ | Declaratory Judgment |
| 004 | ___ | Injunction |
| 008 | ___ | Mechanic's Lien |
| 003 | ___ | Mortgage Foreclosure |

007 ___ General Chancery

- ___ Accounting
- ___ Arbitration Awards
- ___ Certiorari
- ___ Dissolution of Corporation
- ___ Dissolution of Partnership
- ___ Equitable Lien
- ___ Interpleader
- ___ Mandamus
- ___ Ne Exeat

- ___ Partition
- ___ Quiet Title
- ___ Quo Warranto
- ___ Redemption Rights
- ___ Reformation of a Contract
- ___ Rescission of a Contract
- ___ Specific Performance
- ___ Trust Construction
- ___ Other _____

By: /s/ _____
    Attorney      Pro Se

Atty. No.: 44146
Name: Myles McGuire
Atty. for: Plaintiff
Address: 53 West Jackson Blvd., Ste. 550
City/State/Zip: Chicago, IL 60604
Telephone: (312) 589-6370

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| NIKOLAY ANTONOV, individually and on behalf of a class of similarly situated individuals, | )<br>)<br>)<br>) | |
| Plaintiff, | )<br>) | No. **08CH26229** |
| v. | )<br>) | |
| THUMBPLAY, INC., a Delaware corporation, | )<br>)<br>) | |
| Defendant. | )<br>)<br>) | **Jury Trial Demanded** |

## CLASS ACTION COMPLAINT

Plaintiff Nikolay Antonov brings this class action complaint against Defendant Thumbplay, Inc. seeking to stop Defendant's unlawful practice of charging cellular telephone customers for products and services the customers have not authorized, a practice which has resulted in Defendant unlawfully collecting money from consumers throughout the nation, and to obtain redress for all persons injured by such conduct. Plaintiff, for his class action complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

### PARTIES

1. Plaintiff Nikolay Antonov is a resident of Illinois.

2. Defendant Thumbplay, Inc. ("Thumbplay") is a provider of mobile content in the United States. Thumbplay is a Delaware corporation headquartered in New York. Thumbplay does business throughout the nation including Illinois and this county.

1

## VENUE

3. Venue is proper in Cook County because Defendant does business in Cook County.

## CONDUCT COMPLAINED OF

4. This case arises from two closely related phenomena. The first is the capability of most cellular telephones, not only to make and receive telephone calls, but also to send and receive text messages, including – most significantly for present purposes – "premium" text message services. These services, also known as "mobile content," include products that range from the basic (customized ringtones for use with cell phones, sports score reports, weather alerts, stock tips, horoscope services, and the like) to those requiring more advanced capabilities (such as direct payment services, interactive radio, and participatory television).

5. The second underlying phenomenon of this case constitutes its very core. That is, just as providers of premium mobile content, such as Defendant, deliver their products by means of cell phone technology, they likewise charge and collect from their customers by "piggybacking" on the cell phone bills sent out by wireless carriers. Further, because the mobile content providers by themselves most often lack the wherewithal to negotiate the necessary relationships with the much larger wireless carriers, they do so with the help of third-party companies known as aggregators. These aggregators act as middle-men, representing numerous mobile content providers in arriving at the agreements that allow them to use the billing and collection mechanisms of the wireless carriers. In turn, both the aggregators and the wireless carriers are compensated for their services by retaining a substantial percentage of the amount received from each transaction.

2

6. The rapid and largely unplanned growth of the premium mobile content industry has led both to the above-described structure and to a disastrous flaw within it. That flaw – understood, perpetuated, and even encouraged by carriers, aggregators, affiliate marketers, and major licensors of copyrighted music such as the instant Defendant – is an open secret within the industry, but little understood outside of it. In short, the billing and collection systems established by companies, including Defendant, in aid of and enriching the premium mobile content industry are conspicuously free of any checks or safeguards to prevent erroneous and unauthorized charges from being added to customers' bills.

7. As Defendant also knows, significant amounts of money have been collected on account of such unauthorized charges for premium mobile content in the industry over the last few years. And while it has always been within the power of companies such as Defendant to institute simple and effective measures that would prevent this, they have instead knowingly maintained the very system that has allowed these erroneous charges. Indeed, Defendant has reaped and retained their shares of the improper collections.

8. While the total sales of premium mobile content in 2008 amount to a significant sum, the business is still in its infancy. The burgeoning industry has already expanded from ordinary ringtones into mass media-related products such as interactive radio and participatory voting at television and concert events and, most recently, into services that enable cell phones to function as credit cards. Unchecked, Defendant's practices will injure an ever-increasing number of unwitting consumers.

### Thumbplay's Role in the Scheme to Defraud

9. Unlike transactions made using checks and credit cards, which require a signature or a highly private sixteen-digit credit card number, the only thing a mobile content provider

3

such as Defendant Thumbplay needs to charge a consumer for its products is the consumer's cellular telephone number. Once a mobile content provider has a consumer's cell phone number, it can cause that consumer to be billed for services and products irrespective of whether the consumer actually agreed to purchase them.

10. Mobile content providers such as Defendant Thumbplay can simply provide that cellular phone number, along with an amount to be charged, to a billing aggregator. The aggregator, in turn, instructs the relevant cellular carrier to add the charge to the bill associated with that number. The charge will then appear on the consumer's cell phone bill, often with only minimal, cryptic identifying information.

11. Because the protections normally present in consumer transactions – such as signatures and private credit card numbers – are absent from this process, the likelihood of false charges increases enormously. And, because a substantial part of mobile content "sales" are effected through web sites using misleading, oblique, or inadequately explained "consent" procedures, that likelihood increases by another order of magnitude. Mobile content providers such as Thumbplay have powerful financial incentives to collect as many cell phone numbers as possible, but little incentive to ensure that the owners of those numbers have truly agreed to purchase their goods and services.

12. As it also knows, Thumbplay routinely processes charges for mobile content that have not been authorized by the charged party.

13. As a result, Thumbplay has for years been systematically, repeatedly and without authorization, billing its customers for purchase of products and services not agreed to by those customers. Thumbplay and third-party service providers have, on information and belief, profited significantly through this practice.

4

14. Defendant's Thumbplay's cooperates with numerous other companies in the scheme to fraud, including aggregators, copyright licensors and affiliate marketers, among others.

### Aggregator's Role in the Scheme to Defraud

15. In order to tap into the emerging wireless content marketplace and make content services available to wireless consumers, content providers must first obtain access to wireless carriers' mobile communications networks and frequently do so by "partnering" with aggregators – intermediary companies that offer content providers (their "content provider partners") direct access to the carriers through existing relationships. This allows content providers to focus on developing and marketing branded content, applications, and programs while aggregators manage the complex carrier relationships, distribution, billing, and customer service.

16. Aggregators operate mobile transaction networks that help companies develop, deliver, and bill for mobile content services to compatible mobile devices throughout the State of Illinois and the nation.

17. By using their end-to-end technology platforms, their relationships with U.S. carriers, and other value-added services, these aggregators have forged a crucial link between wireless carriers and mobile content providers. They have enabled the transformation of wireless technology into a marketing, content delivery, and collections process, while carving out a profitable role for themselves as very critical middlemen in this rapidly growing industry.

18. Aggregators have developed a vast distribution system that integrates into the wireless networks of some of the largest wireless carriers nationwide, providing direct connections to hundreds of mobile operators.

5

19. While aggregators charge their content provider customers some upfront fees, their revenue is primarily generated through a "revenue share" on transactions for which they bill cell phone subscribers: each time a charge is incurred in connection with the purchase of mobile content services, the aggregator and/or the content provider cause said charge to be billed directly on the cellular telephone bill of the carrier's customer who currently owns and/or uses the telephone number (claimed to be) associated with said purchase.

20. The carrier then bills and collects the charge from their current subscriber, retains a portion of the proceeds as their "revenue share," and remits the balance to the aggregator who has direct access to their network and who retains a percentage of the balance in the form of their own "revenue share." The aggregator then remits the remainder directly to the mobile content provider (or, in some instances, to another aggregator who retains a percentage of the balance in the form of their own "revenue share" and remits the balance to their mobile content provider client).

21. Aggregators have in the United States registered numerous transactions and processed significant amounts of money in transactions over recent years and have profited greatly from their arrangement with their industry partners.

**Copyright Licensor's Role in the Scheme to Defraud**

22. Since the advent of customized cellular telephone ringers, the demand for mobile content based on copyrighted music has grown exponentially and today accounts for a significant percentage of all mobile content providers' revenue, including Defendant Thumbplay. In order to tap into such demand, mobile content providers must first obtain permission from the copyright owners of the music that is to be sold in the form of ringtones.

6

23. Owners of copyrighted music, such as Universal Music Group, Inc., among many others, have licensed parts of their libraries of copyrighted music to numerous mobile content providers including Defendant Thumbplay for the latter to sell to consumers in the form of ringtones. This arrangement allows Thumbplay to focus on developing and marketing content, applications and programs based on the copyrighted music while allowing the copyright owners to remain silent partners operating primarily in the background.

24. While copyright owners are ordinarily compensated by their content provider partners such as Thumbplay through upfront fees, their revenue is frequently generated through a "revenue share" or "equity share" based on mobile content transactions involving their copyrighted material: each time a charge is incurred in connection with the purchase of their copyrighted mobile content, the content provider causes that charge to be billed directly on the cellular telephone bill of the carrier's customer who currently owns and/or uses the telephone number (claimed to be) associated with said purchase.

25. Licensors have, in Illinois and throughout the nation, registered numerous transactions and processed significant amounts of money over recent years, profiting greatly from its arrangements with its industry partners.

26. Licensors have not only sanctioned illegal billing, it has actively promoted it by negotiating and facilitating partnerships between themselves and mobile-content providers such as Defendant Thumbplay, and by failing to maintain adequate safeguards to prevent unauthorized charges. Despite their knowledge of such illegal practices and lack of reliable safeguards, Licensors continue to collect revenue for the sale of unauthorized mobile content.

7

### Affiliate Marketer's Role in the Scheme to Defraud

27. Affiliate marketers are internet advertising networks that provide a distribution platform for mobile content providers' products and services.

28. Advertising is an essential step in the mobile content ecosystem. Without the ability to drive users to their websites, mobile content providers such as Thumbplay would be unable to earn virtually any revenue, no matter how misleading or fraudulent their services. Absent advertising through these so-called affiliate marketers, the fraudulent mobile content providers would have significantly fewer visitors to their websites and their illegal revenues would drop dramatically.

29. Many affiliate marketers with whom mobile content providers contract, including on information and belief Defendant Thumbplay, fail to clearly and accurately disclose a host of highly relevant information to consumers about purchasing mobile content, such as the service's price, subscription period and cancellation procedures, among others.

30. Indeed, many affiliate marketers specifically employ anti-consumer practices simply to achieve the next "sale," including so-called "negative options" which involves the practice of presenting a consumer with an opportunity to consent in advance to continue to receive products or services in the future until cancelled. In such situations the seller frequently interprets the consumer's silence or failure to take an affirmative action to reject goods or services, or to cancel the sales agreement, as an agreement to continue to receive the offer, when in fact the consumer intends just the opposite. Moreover, one of the mobile content industry's largest affiliate marketers, Epic Advertising, Inc. f/k/a Azoogleads US, Inc. ("Azoogle"), recently settled claims brought against it by the Office of the Attorney General of the State of Florida for deceptively marketing mobile content through a negative option rubric.

8

30. Defendant Thumbplay knows affiliate marketers are loathe to adequately disclose the relevant information about purchasing mobile content for fear of scaring off potential customers. Fortunately for deceptive affiliate marketers, however, Thumbplay has systematically declined to require those with whom it contracts to obtain consumers' true advance consent before causing such consumers to be billed.

31. Indeed, if Defendant wanted to end this illegal billing, it could do so in an instant. All it would have to do to ensure that they are obtaining the consent of the charged party is agree to process a unique "access code" for each customer account, provided by the carrier to the account holder and his/her authorized representatives at the time it is opened, and require that it be produced anytime a third-party attempts to charge the account. If a matching access code is not provided, no charges would be included on the customer's billing statement.

32. But, instead of implementing such a simple safeguard, Defendant has intentionally created, maintained and promoted a system that encourages fraud at every step. Such a system constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.

33. Defendant's conduct is by no means accidental. As previously alleged, they know that many of their cellular telephone customers dispute claims of consent to be charged for mobile content services. Defendant further knows that they cannot authenticate such customer's authority to be billed for mobile content. In light of its knowledge of these facts, Defendant's decision to continue to charge their customers for mobile content without taking steps to authenticate the representations of customer authentication by other Defendant's constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.

9

34. Because the amount Defendant's is taking is small on an individual basis – as little as a few dollars to at most several hundreds of dollars per person – Defendant employs this scheme with the hope and expectation that its illegal conduct will go unpunished.

### THE FACTS RELATING TO THE NAMED PLAINTIFF

35. In or about 2007, new cell phone service was purchased by Plaintiff from an authorized representative of an established wireless carrier.

36. On that same day, in exchange for a cellular telephone service plan, Plaintiff agreed to pay Thumbplay a set monthly fee for a period of approximately 12 months.

37. In or about 2008, Plaintiff's cell phone account was charged for unwanted and unauthorized mobile content services.

38. At no time did Plaintiff authorize the purchase of these products and services offered by Defendant, nor did Plaintiff consent to the receipt of text messages to his cellular telephone.

39. At no time did Plaintiff authorize Defendant or anyone else to bill him for these services.

40. Defendant have yet to provide Plaintiff a full refund of the unauthorized charges (i.e. premium text message charges, ordinary text messages, data charges, back interest), nor an assurance that such unauthorized charges would not appear in future billing periods.

### CLASS ALLEGATIONS

41. Plaintiff brings this action on behalf of himself and a Class and Subclass, defined as follows:

(a) a class ("the Class") consisting of all wireless telephone subscribers in the nation who suffered losses or damages as a result of Thumbplay billing for mobile content products and

10

services not authorized by the subscriber; provided, however, that the following are excluded from this proposed Class: (i) the Defendant, and (ii) any employee of Defendant;

(b) a subclass (the "Subclass") consisting of all Illinois resident members of the Class, provided, however, that the following are excluded from this proposed Class: (i) the Defendant, and (ii) any employee of Defendant.

42. Plaintiff's claims are typical of the claims of the other Class and Subclass members.

43. Plaintiff will fairly and adequately represent and protect the interests of the other Class and Subclass members. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other Class and Subclass members, and have the financial resources to do so. Neither do Plaintiff or his counsel have any interest adverse to those of the other Class and Subclass members.

44. Absent a class action, most members of the Class and Subclass would find the cost of litigating their claims to be prohibitive, and would have no effective remedy. Class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the Judiciary and the litigants, and promotes consistency and efficiency of adjudication.

45. Defendant have acted and failed to act on grounds generally applicable to Plaintiff and the other Class and Subclass members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the other Class and Subclass members.

46. The factual and legal bases of Defendant's liability to Plaintiff and the other Class and Subclass members are the same, resulting in injury to Plaintiff and to the other Class and

11

Subclass members. Plaintiff and the other Class and Subclass members have all suffered harm and damages as a result of Defendant's unlawful and wrongful conduct.

47. There are many questions of law and fact common to the claims of Plaintiff and the other Class and Subclass members, and those questions predominate over any questions that may affect individual Class and Subclass members. Common questions for the Class include but are not limited to the following:

  (a) Whether Thumbplay's conduct described herein is unjust enrichment.

  (b) Whether Thumbplay's conduct described herein is tortuous interference with a contract.

Common questions for the Subclass include but are not limited to the following:

  (a) Whether Thumbplay's conduct described herein is consumer fraud.

## COUNT I
### (Restitution/Unjust Enrichment on behalf of the Class)

48. Plaintiff incorporates by reference the foregoing allegations.

49. A benefit has been conferred upon Thumbplay by Plaintiff and the Class. Thumbplay has received and retained money belonging to Plaintiff and the Class resulting from its billing and collecting unauthorized third party mobile content charges.

50. Thumbplay appreciates or has knowledge of said benefit.

51. Under principles of equity and good conscience, Thumbplay should not be permitted to retain the money belonging to Plaintiff and the Class which Thumbplay has unjustly received as a result of its actions.

12

## COUNT II
### (Tortious Interference with a Contract on behalf of the Class)

52. Plaintiff incorporates by reference the foregoing allegations.

53. Plaintiffs and the Class had contractual relationships with their wireless carriers whereby they agreed to pay a certain sum of money in exchange for activation of their cellular telephone accounts and their carriers' promise to provide various communication and related services to Plaintiff and the Class and to bill Plaintiff and the Class only for products or services the purchase of which they authorized.

54. Thumbplay knew of said contractual relationships and intended to and did induce a breach or disruption of the contractual relationships.

55. Thumbplay intentionally interfered with said contractual relationship through improper motives and/or means by knowingly and/or recklessly continually causing to be placed on the cellular telephone bills of cellular telephone owners across the nation unauthorized charges.

56. Plaintiff and the Class suffered loss as a direct result of the conduct of Thumbplay.

## COUNT III
### (Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act on Behalf of the Subclass)

57. Plaintiff incorporates by reference the foregoing allegations.

58. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA") declares unlawful "any [u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such

13

material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."

59. Thumbplay violated, and continues to violate this proscription through its conduct alleged above.

60. Thumbplay, through its acts of unfair competition, has obtained money from Plaintiff and members of the Class. Plaintiff and the members of the Class ask that this Court restore that money to Plaintiff and enjoin Defendant from continuing their illegal practices.

61. Such conduct is ongoing and continues to this date. Plaintiff, the Class members and the general public are therefore entitled to the relief described herein.

WHEREFORE, Plaintiff Nikolay Antonov, on behalf of himself and the Class and Subclass, prays for the following relief:

  a. Certify this case as a class action on behalf of the Class and Subclass as defined above and appoint Nikolay Antonov Class Representative, and appoint the undersigned as lead counsel;

  b. Declare that the actions of Thumbplay, as set out above, constitute unjust enrichment, and tortuous interference with a contract;

  c. Enter judgment against Thumbplay for all economic, monetary, actual, consequential, and compensatory damages caused by its conduct;

  d. Award Plaintiff and the Class and Subclass reasonable costs and attorneys' fees;

  e. Award Plaintiff and the Class and Subclass pre- and post-judgment interest;

  f. Enter judgment for injunctive, statutory, and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class and Subclass;

  g. Declare that the actions of Thumbplay, as set forth above, as well as in other respects, constitute a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act on behalf of the Subclass; and

h. Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: July 18, 2008

Respectfully submitted,

NIKOLAY ANTONOV, individually and
on behalf of a class of similarly situated individuals

One of his attorneys

Jay Edelson
Myles McGuire
Ethan Preston
Ryan Andrews
KAMBEREDELSON, LLC
53 West Jackson Blvd.
Suite 550
Chicago, Illinois 60604
Telephone: (312) 589-6370
Firm ID: 44146

15