UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NIKOLAY ANTONOV, individually and on behalf of a class of similarly situated individuals,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>Thumbplay, Inc., a Delaware Corporation,<br><br>　　　　　　　Defendant. | Case No:_____<br><br>Answer<br>FILED: AUG. 07, 2008<br>08CV4468<br>JUDGE NORGLE<br>MAGISTRATE JUDGE NOLAN<br><br>AEE |

Defendant Thumbplay, Inc. ("Thumbplay") by its attorneys Eimer Stahl Klevorn & Solberg LLP and Paul, Weiss, Rifkind, Wharton & Garrison LLP, answer the complaint in this action as follows:

**PARTIES**

1.　　Plaintiff Nikolay Antonov is a resident of Illinois.

**ANSWER:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1.

2.　　Defendant Thumbplay, Inc. ("Thumbplay") is a provider of mobile content in the United States. Thumbplay is a Delaware corporation headquartered in New York. Thumbplay does business throughout the nation including Illinois and this county.

**ANSWER:** Denies the allegations in paragraph 2 of the Complaint, except admits that Thumbplay is a provider of mobile content services in the United States; that Thumbplay is a corporation duly formed and existing under the laws of the State of Delaware, with its principal place of business in New York; and that Thumbplay has subscribers in the State of Illinois and Cook County and elsewhere in the United States.

## VENUE

3.  Venue is proper in Cook County because Defendant does business in Cook County.

**ANSWER:** Avers that the allegations in paragraph 3 of the Complaint state legal conclusions for which no answer is required. To the extent that paragraph 3 is interpreted to assert factual allegations that require an answer, Thumbplay denies the allegations in paragraph 3, except admits that Thumbplay has subscribers in Cook County.

## FACTUAL ALLEGATIONS

4.  This case arises from two closely related phenomena. The first is the capability of most cellular telephones, not only to make and receive telephone calls, but also to send and receive text messages, including - most significantly for present purposes - "premium" text message services. These services, also known as "mobile content," include products that range from the basic (customized ringtones for use with cell phones, sports score reports, weather alerts, stock tips, horoscope services, and the like) to those requiring more advanced capabilities (such as direct payment services, interactive radio, and participatory television).

**ANSWER:** Denies the allegations in paragraph 4 of the Complaint, except admits that "mobile content" may include ringtones, sports score reports, weather alerts, stock tips, horoscope services, radio, television and direct payment services.

5.  The second underlying phenomenon of this case constitutes its very core. That is, just as providers of premium mobile content, such as Defendant, deliver their products by means of cell phone technology, they likewise charge and collect from their customers by "piggybacking" on the cell phone bills sent out by wireless carriers. Further, because the mobile content providers by themselves most often lack the wherewithal to negotiate the necessary relationships with the much larger wireless carriers, they do so with the help of third-party companies known as aggregators. These aggregators act as middle-men, representing numerous mobile content providers in arriving at the agreements that allow them to use the billing and collection mechanisms of the wireless carriers. In turn, both the aggregators and the wireless carriers are compensated for their services by retaining a substantial percentage of the amount received from each transaction.

**ANSWER:** Denies the allegations in paragraph 5 of the Complaint, except admits that Thumbplay contracts with entities that are commonly referred to as aggregators.

6.  The rapid and largely unplanned growth of the premium mobile content industry has led both to the above-described structure and to a disastrous flaw within it. That

2

flaw - understood, perpetuated, and even encouraged by carriers, aggregators, affiliate marketers, and major licensors of copyrighted music such as the instant Defendant - is an open secret within the industry, but little understood outside of it. In short, the billing and collection systems established by companies, including Defendant, in aid of and enriching the premium mobile content industry are conspicuously free of any checks or safeguards to prevent erroneous and unauthorized charges from being added to customers' bills.

**ANSWER:** Denies the allegations in paragraph 6 of the Complaint.

7. As Defendant also knows, significant amounts of money have been collected on account of such unauthorized charges for premium mobile content in the industry over the last few years. And while it has always been within the power of companies such as Defendant to institute simple and effective measures that would prevent this, they have instead knowingly maintained the very system that has allowed these erroneous charges. Indeed, Defendant has reaped and retained their shares of the improper collections.

**ANSWER:** Denies the allegations in paragraph 7 of the Complaint.

8. While the total sales of premium mobile content in 2008 amount to a significant sum, the business is still in its infancy. The burgeoning industry has already expanded from ordinary ringtones into mass media-related products such as interactive radio and participatory voting at television and concert events and, most recently, into services that enable cell phones to function as credit cards. Unchecked, Defendant's practices will injure an ever-increasing number of unwitting consumers.

**ANSWER:** The allegations in paragraph 8 of the Complaint state opinions for which no answer is required. To the extent that paragraph 8 is interpreted to assert factual allegations that require an answer, Thumbplay denies the allegations in paragraph 8 of the Complaint, except admits that the mobile content industry has expanded into various products and services, which may include ringtones, interactive radio, and participatory voting at television and concert events.

9. Unlike transactions made using checks and credit cards, which require a signature or a highly private sixteen-digit credit card number, the only thing a mobile content provider such as Defendant Thumbplay needs to charge a consumer for its products is the consumer's cellular telephone number. Once a mobile content provider has a consumer's cell phone number, it can cause that consumer to be billed for services and products irrespective of whether the consumer actually agreed to purchase them.

**ANSWER:** Denies the allegations in paragraph 9 of the Complaint.

10. Mobile content providers such as Defendant Thumbplay can simply provide that cellular phone number, along with an amount to be charged, to a billing aggregator. The

3

aggregator, in turn, instructs the relevant cellular carrier to add the charge to the bill associated with that number. The charge will then appear on the consumer's cell phone bill, often with only minimal, cryptic identifying information.

**ANSWER:** Denies the allegations in paragraph 10 of the Complaint.

11.     Because the protections normally present in consumer transactions - such as signatures and private credit card numbers - are absent from this process, the likelihood of false charges increases enormously. And, because a substantial part of mobile content "sales" are effected through web sites using misleading, oblique, or inadequately explained "consent" procedures, that likelihood increases by another order of magnitude. Mobile content providers such as Thumbplay have powerful financial incentives to collect as many cell phone numbers as possible, but little incentive to ensure that the owners of those numbers have truly agreed to purchase their goods and services.

**ANSWER:** Denies the allegations in paragraph 11 of the Complaint.

12.     As it also knows, Thumbplay routinely processes charges for mobile content that have not been authorized by the charged party.

**ANSWER:** Denies the allegations in paragraph 12 of the Complaint.

13.     As a result, Thumbplay has for years been systematically, repeatedly and without authorization, billing its customers for purchase of products and services not agreed to by those customers. Thumbplay and third-party service providers have, on information and belief, profited significantly through this practice.

**ANSWER:** Denies the allegations in paragraph 13 of the Complaint.

14.     Defendant's Thumbplay's cooperates with numerous other companies in the scheme to fraud, including aggregators, copyright licensors and affiliate marketers, among others.

**ANSWER:** Denies the allegations in paragraph 14 of the Complaint.

15.     In order to tap into the emerging wireless content marketplace and make content services available to wireless consumers, content providers must first obtain access to wireless carriers' mobile communications networks and frequently do so by "partnering" with aggregators - intermediary companies that offer content providers (their "content provider partners") direct access to the carriers through existing relationships. This allows content providers to focus on developing and marketing branded content, applications, and programs while aggregators manage the complex carrier relationships, distribution, billing, and customer service.

**ANSWER:** Denies the allegations in paragraph 15 of the Complaint, except

admits that Thumbplay contracts with companies commonly referred to as aggregators.

16.　　Aggregators operate mobile transaction networks that help companies develop, deliver, and bill for mobile content services to compatible mobile devices throughout the State of Illinois and the nation.

**ANSWER:** Thumbplay is without knowledge or information sufficient to admit or deny the allegations in paragraph 16 and therefore denies same.

17.　　By using their end-to-end technology platforms, their relationships with U.S. carriers, and other value-added services, these aggregators have forged a crucial link between wireless carriers and mobile content providers. They have enabled the transformation of wireless technology into a marketing, content delivery, and collections process, while carving out a profitable role for themselves as very critical middlemen in this rapidly growing industry.

**ANSWER:** Thumbplay is without knowledge or information sufficient to admit or deny the allegations in paragraph 17 and therefore denies same.

18.　　Aggregators have developed a vast distribution system that integrates into the wireless networks of some of the largest wireless carriers nationwide, providing direct connections to hundreds of mobile operators.

**ANSWER:** Thumbplay is without knowledge or information sufficient to admit or deny the allegations in paragraph 18 and therefore denies same.

19.　　While aggregators charge their content provider customers some upfront fees, their revenue is primarily generated through a "revenue share" on transactions for which they bill cell phone subscribers: each time a charge is incurred in connection with the purchase of mobile content services, the aggregator and/or the content provider cause said charge to be billed directly on the cellular telephone bill of the carrier's customer who currently owns and/or uses the telephone number (claimed to be) associated with said purchase.

**ANSWER:** Denies the allegations in paragraph 19 of the Complaint insofar as they purport to describe the business practices of Thumbplay and is without knowledge or information sufficient to admit or deny the allegations therein with respect to other persons and therefore denies same.

20.　　The carrier then bills and collects the charge from their current subscriber, retains a portion of the proceeds as their "revenue share," and remits the balance to the aggregator who has direct access to their network and who retains a percentage of the balance in the form of their own "revenue share." The aggregator then remits the remainder directly to the mobile content provider (or, in some instances, to another aggregator who retains a

5

percentage of the balance in the form of their own "revenue share" and remits the balance to their mobile content provider client).

**ANSWER:** Thumbplay is without knowledge or information sufficient to admit or deny the allegations in paragraph 20 and therefore denies same.

21.    Aggregators have in the United States registered numerous transactions and processed significant amounts of money in transactions over recent years and have profited greatly from their arrangement with their industry partners.

**ANSWER:** Thumbplay is without knowledge or information sufficient to admit or deny the allegations in paragraph 21 and therefore denies same.

22.    Since the advent of customized cellular telephone ringers, the demand for mobile content based on copyrighted music has grown exponentially and today accounts for a significant percentage of all mobile content providers' revenue, including Defendant Thumbplay. In order to tap into such demand, mobile content providers must first obtain permission from the copyright owners of the music that is to be sold in the form of ringtones.

**ANSWER:** Denies the allegations in paragraph 22 of the Complaint, except admits that Thumbplay derives revenue from mobile content based on copyrighted music and that Thumbplay obtained permission from the copyright owners to sell ringtones based on the copyrighted music.

23.    Owners of copyrighted music, such as Universal Music Group, Inc., among many others, have licensed parts of their libraries of copyrighted music to numerous mobile content providers including Defendant Thumbplay for the latter to sell to consumers in the form of ringtones. This arrangement allows Thumbplay to focus on developing and marketing content, applications and programs based on the copyrighted music while allowing the copyright owners to remain silent partners operating primarily in the background.

**ANSWER:** Denies the allegations in paragraph 23 of the Complaint insofar as they purport to describe the business practices of Thumbplay, except admits that Thumbplay has licenses from owners with copyright owners to sell the copyrighted music in the form of ringtones, and is without knowledge or information sufficient to admit or deny the allegations therein with respect to other persons and therefore denies same.

24.    While copyright owners are ordinarily compensated by their content provider partners such as Thumbplay through upfront fees, their revenue is frequently generated

6

through a "revenue share" or "equity share" based on mobile content transactions involving their copyrighted material: each time a charge is incurred in connection with the purchase of their copyrighted mobile content, the content provider causes that charge to be billed directly on the cellular telephone bill of the carrier's customer who currently owns and/or uses the telephone number (claimed to be) associated with said purchase.

**ANSWER:** Denies the allegations in paragraph 24 of the Complaint insofar as they purport to describe the business practices of Thumbplay, and is without knowledge or information sufficient to admit or deny the allegations therein with respect to other persons and therefore denies same.

25. Licensors have, in Illinois and throughout the nation, registered numerous transactions and processed significant amounts of money over recent years, profiting greatly from its arrangements with its industry partners.

**ANSWER:** Thumbplay is without knowledge or information sufficient to admit or deny the allegations in paragraph 25 and therefore denies same.

26. Licensors have not only sanctioned illegal billing, it has actively promoted it by negotiating and facilitating partnerships between themselves and mobile-content providers such as Defendant Thumbplay, and by failing to maintain adequate safeguards to prevent unauthorized charges. Despite their knowledge of such illegal practices and lack of reliable safeguards, Licensors continue to collect revenue for the sale of unauthorized mobile content.

**ANSWER:** Denies the allegations in paragraph 26 of the Complaint insofar as they purport to describe the business practices of Thumbplay, and is without knowledge or information sufficient to admit or deny the allegations therein with respect to other persons and therefore denies same.

27. Affiliate marketers are internet advertising networks that provide a distribution platform for mobile content providers' products and services.

**ANSWER:** Thumbplay is without knowledge or information sufficient to admit or deny the allegations in paragraph 27 and therefore denies same.

28. Advertising is an essential step in the mobile content ecosystem. Without the ability to drive users to their websites, mobile content providers such as Thumbplay would be unable to earn virtually any revenue, no matter how misleading or fraudulent their services. Absent advertising through these so-called affiliate marketers, the fraudulent mobile content

providers would have significantly fewer visitors to their websites and their illegal revenues would drop dramatically.

**ANSWER:** Denies the allegations in paragraph 28 of the Complaint insofar as they purport to describe the business practices of Thumbplay, and is without knowledge or information sufficient to admit or deny the allegations therein with respect to other persons and therefore denies same.

29. Many affiliate marketers with whom mobile content providers contract, including on information and belief Defendant Thumbplay, fail to clearly and accurately disclose a host of highly relevant information to consumers about purchasing mobile content, such as the service's price, subscription period and cancellation procedures, among others.

**ANSWER:** Denies the allegations in paragraph 29 of the Complaint insofar as they purport to describe the business practices of Thumbplay, and is without knowledge or information sufficient to admit or deny the allegations therein with respect to other persons and therefore denies same.

30. Indeed, many affiliate marketers specifically employ anti-consumer practices simply to achieve the next "sale," including so-called "negative options" which involves the practice of presenting a consumer with an opportunity to consent in advance to continue to receive products or services in the future until cancelled. In such situations the seller frequently interprets the consumer's silence or failure to take an affirmative action to reject goods or services, or to cancel the sales agreement, as an agreement to continue to receive the offer, when in fact the consumer intends just the opposite. Moreover, one of the mobile content industry's largest affiliate marketers, Epic Advertising, Inc. f/k/a Azoogleads US, Inc. ("Azoogle"), recently settled claims brought against it by the Office of the Attorney General of the State of Florida for deceptively marketing mobile content through a negative option rubric.

**ANSWER:** Denies the allegations in paragraph 30 of the Complaint.

30. Defendant Thumbplay knows affiliate marketers are loathe to adequately disclose the relevant information about purchasing mobile content for fear of scaring off potential customers. Fortunately for deceptive affiliate marketers, however, Thumbplay has systematically declined to require those with whom it contracts to obtain consumers' true advance consent before causing such consumers to be billed.

**ANSWER:** Denies the allegations in paragraph 30 of the Complaint.

31. Indeed, if Defendant wanted to end this illegal billing, it could do so in an instant. All it would have to do to ensure that they are obtaining the consent of the charged

party is agree to process a unique "access code" for each customer account, provided by the carrier to the account holder and his/her authorized representatives at the time it is opened, and require that it be produced anytime a third-party attempts to charge the account. If a matching access code is not provided, no charges would be included on the customer's billing statement.

**ANSWER:** The allegations in paragraph 31 of the Complaint state opinions for which no answer is required. To the extent that paragraph 31 is interpreted to assert factual allegations that require an answer, Thumbplay denies the allegations in paragraph 31 of the Complaint.

32. But, instead of implementing such a simple safeguard, Defendant has intentionally created, maintained and promoted a system that encourages fraud at every step. Such a system constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.

**ANSWER:** Denies the allegations in paragraph 32 of the Complaint.

33. Defendant's conduct is by no means accidental. As previously alleged, they know that many of their cellular telephone customers dispute claims of consent to be charged for mobile content services. Defendant further knows that they cannot authenticate such customer's authority to be billed for mobile content. In light of its knowledge of these facts, Defendant's decision to continue to charge their customers for mobile content without taking steps to authenticate the representations of customer authentication by other Defendant's constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.

**ANSWER:** Denies the allegations in paragraph 33 of the Complaint.

34. Because the amount Defendant's is taking is small on an individual basis - as little as a few dollars to at most several hundreds of dollars per person - Defendant employs this scheme with the hope and expectation that its illegal conduct will go unpunished.

**ANSWER:** Denies the allegations in paragraph 34 of the Complaint.

35. In or about 2007, new cell phone service was purchased by Plaintiff from an authorized representative of an established wireless carrier.

**ANSWER:** Thumbplay is without knowledge or information sufficient to admit or deny the allegations in paragraph 35 and therefore denies same.

36. On that same day, in exchange for a cellular telephone service plan, Plaintiff agreed to pay Thumbplay a set monthly fee for a period of approximately 12 months.

**ANSWER:** Thumbplay is without knowledge or information sufficient to admit or deny the allegations in paragraph 36 and therefore denies same.

37. In or about 2008, Plaintiffs cell phone account was charged for unwanted and unauthorized mobile content services.

**ANSWER:** Thumbplay is without knowledge or information sufficient to admit or deny the allegations in paragraph 37 and therefore denies same.

38. At no time did Plaintiff authorize the purchase of these products and services offered by Defendant, nor did Plaintiff consent to the receipt of text messages to his cellular telephone.

**ANSWER:** Thumbplay is without knowledge or information sufficient to admit or deny the allegations in paragraph 38 and therefore denies same.

39. At no time did Plaintiff authorize Defendant or anyone else to bill him for these services.

**ANSWER:** Thumbplay is without knowledge or information sufficient to admit or deny the allegations in paragraph 39 and therefore denies same.

40. Defendant have yet to provide Plaintiff a full refund of the unauthorized charges (i.e. premium text message charges, ordinary text messages, data charges, back interest), nor an assurance that such unauthorized charges would not appear in future billing periods.

**ANSWER:** Thumbplay is without knowledge or information sufficient to admit or deny the allegations in paragraph 40 and therefore denies same.

## CLASS ALLEGATIONS

41. Plaintiff brings this action on behalf of himself and a Class and Subclass, defined as follows:

(a) a class ("the Class") consisting of all wireless telephone subscribers in the nation who suffered losses or damages as a result of Thumbplay billing for mobile content products and services not authorized by the subscriber; provided, however, that the following are excluded from this proposed Class: (i) the Defendant, and (ii) any employee of Defendant;

10

    (b)  a subclass (the "Subclass") consisting of all Illinois resident members of the Class, provided, however, that the following are excluded from this proposed Class: (i) the Defendant, and (ii) any employee of Defendant.

  **ANSWER:** Avers that the allegations in paragraph 41 of the Complaint state opinions and legal conclusions for which no answer is required.

  42.  Plaintiff's claims are typical of the claims of the other Class and Subclass members.

  **ANSWER:** Avers that the allegations in paragraph 42 of the Complaint state opinions and legal conclusions for which no answer is required.

  43.  Plaintiff will fairly and adequately represent and protect the interests of the other Class and Subclass members. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other Class and Subclass members, and have the financial resources to do so. Neither do Plaintiff or his counsel have any interest adverse to those of the other Class and Subclass members.

  **ANSWER:** Avers that the allegations in paragraph 43 of the Complaint state opinions and legal conclusions for which no answer is required.

  44.  Absent a class action, most members of the Class and Subclass would find the cost of litigating their claims to be prohibitive, and would have no effective remedy. Class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the Judiciary and the litigants, and promotes consistency and efficiency of adjudication.

  **ANSWER:** Avers that the allegations in paragraph 44 of the Complaint state opinions and legal conclusions for which no answer is required.

  45.  Defendant have acted and failed to act on grounds generally applicable to Plaintiff and the other Class and Subclass members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the other Class and Subclass members.

  **ANSWER:** Avers that the allegations in paragraph 45 of the Complaint state opinions and legal conclusions for which no answer is required. To the extent that

paragraph 45 is interpreted to state factual allegations, Thumbplay denies the allegations in paragraph 45 of the Complaint.

46. The factual and legal bases of Defendant's liability to Plaintiff and the other Class and Subclass members are the same, resulting in injury to Plaintiff and to the other Class and Subclass members. Plaintiff and the other Class and Subclass members have all suffered harm and damages as a result of Defendant's unlawful and wrongful conduct.

**ANSWER:** Avers that the allegations in paragraph 46 of the Complaint state opinions and legal conclusions for which no answer is required. To the extent that paragraph 46 is interpreted to state factual allegations, Thumbplay denies the allegations in paragraph 46 of the Complaint.

47. There are many questions of law and fact common to the claims of Plaintiff and the other Class and Subclass members, and those questions predominate over any questions that may affect individual Class and Subclass members. Common questions for the Class include but are not limited to the following:
    (a) Whether Thumbplay's conduct described herein is unjust enrichment.
    (b) Whether Thumbplay's conduct described herein is tortuous interference with a contract.
Common questions for the Subclass include but are not limited to the following:
    (a) Whether Thumbplay's conduct described herein is consumer fraud.

**ANSWER:** Avers that the allegations in paragraph 47 of the Complaint state opinions and legal conclusions for which no answer is required.

## COUNT I
### (Restitution/Unjust Enrichment Claim)

48. Plaintiff incorporates by reference the foregoing allegations.

**ANSWER:** For its answer to paragraph 48, incorporates by reference its answers to the preceding paragraphs of the Complaint.

49. A benefit has been conferred upon Thumbplay by Plaintiff and the Class. Thumbplay has received and retained money belonging to Plaintiff and the Class resulting from its billing and collecting unauthorized third party mobile content charges.

**ANSWER:** Denies the allegations in paragraph 49 of the Complaint.

50. Thumbplay appreciates or has knowledge of said benefit.

**ANSWER:** Denies the allegations in paragraph 50 of the Complaint.

51. Under principles of equity and good conscience, Thumbplay should not be permitted to retain the money belonging to Plaintiff and the Class which Thumbplay has unjustly received as a result of its actions.

**ANSWER:** Avers that paragraph 51 of the Complaint states opinions and legal conclusions for which no answer is required. To the extent that paragraph 51 is interpreted to state factual allegations, Thumbplay denies the allegations in paragraph 51 of the Complaint.

## COUNT II
### (Tortious Interference with a Contract Claim)

52. Plaintiff incorporates by reference the foregoing allegations.

**ANSWER:** For its answer to paragraph 52, incorporates by reference its answers to the preceding paragraphs of the Complaint.

53. Plaintiffs and the Class had contractual relationships with their wireless carriers whereby they agreed to pay a certain sum of money in exchange for activation of their cellular telephone accounts and their carriers' promise to provide various communication and related services to Plaintiff and the Class and to bill Plaintiff and the Class only for products or services the purchase of which they authorized.

**ANSWER:** Thumbplay is without knowledge or information sufficient to admit or deny the allegations in paragraph 53 and therefore denies same.

54. Thumbplay knew of said contractual relationships and intended to and did induce a breach or disruption of the contractual relationships.

**ANSWER:** Denies the allegations in paragraph 54 of the Complaint.

55. Thumbplay intentionally interfered with said contractual relationship through improper motives and/or means by knowingly and/or recklessly continually causing to be placed on the cellular telephone bills of cellular telephone owners across the nation unauthorized charges.

**ANSWER:** Denies the allegations in paragraph 55 of the Complaint.

56. Plaintiff and the Class suffered loss as a direct result of the conduct of Thumbplay.

**ANSWER:** Denies the allegations in paragraph 56 of the Complaint.

## COUNT III
### (Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act Claim)

57. Plaintiff incorporates by reference the foregoing allegations.

**ANSWER:** For its answer to paragraph 57, incorporates by reference its answers to the preceding paragraphs of the Complaint.

58. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA") declares unlawful "any [u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact… in the conduct of any trade or commerce... whether any person has in fact been misled, deceived or damaged thereby."

**ANSWER:** Avers that paragraph 58 of the Complaint states legal conclusions for which no answer is required and respectfully refers the Court to the statute cited for the contents therein.

59. Thumbplay violated, and continues to violate this proscription through its conduct alleged above.

**ANSWER:** Denies the allegations in paragraph 59 of the Complaint.

60. Thumbplay, through its acts of unfair competition, has obtained money from Plaintiff and members of the Class. Plaintiff and the members of the Class ask that this Court restore that money to Plaintiff and enjoin Defendant from continuing their illegal practices.

**ANSWER:** Avers that paragraph 60 of the Complaint states opinions and legal conclusions for which no answer is required. To the extent that paragraph 60 is interpreted to state factual allegations, Thumbplay denies the allegations in paragraph 60 of the Complaint.

61. Such conduct is ongoing and continues to this date. Plaintiff, the Class members and the general public are therefore entitled to the relief described herein.

**ANSWER:** Avers that paragraph 61 of the Complaint states opinions and legal conclusions for which no answer is required. To the extent that paragraph 61 is interpreted to state factual allegations, Thumbplay denies the allegations in paragraph 61 of the Complaint.

### AFFIRMATIVE DEFENSES

Thumbplay states the following affirmative defenses without assuming the burden of proof on such defenses as would otherwise rest on Plaintiff:

### FIRST AFFIRMATIVE DEFENSE

The complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by Plaintiff's lack of standing, authority, and/or capacity.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by his failure to mitigate any alleged damages.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to allege and has not suffered any cognizable injury.

Thumbplay hereby states that it intends to rely upon such other defenses as may become available or may appear during the course of proceedings, including discovery, in this case or otherwise, and Thumbplay hereby reserves the right to amend this Answer to assert any and all such defenses.

Thumbplay denies each and every averment of the Complaint that is not specifically admitted herein.

WHEREFORE, Defendant Thumbplay demands:

(a) Judgment dismissing Plaintiff's complaint with prejudice;

(b) The costs of defending this action, including attorneys' fees and expenses; and

(c) Such other relief as the Court deems just and proper.

Dated August 7, 2008

                                                     Respectfully Submitted,

                                                     Thumbplay, Inc.
                                                     By: /s/ Adam B. Deutsch
                                                          One of Its Attorneys


Nathan P. Eimer
Adam B. Deutsch
Greg J. Weintraub
EIMER STAHL KLEVORN & SOLBERG LLP
224 S. Michigan Avenue, Suite 1100
Chicago Illinois 60604
Telephone: (312) 660-7600
Facsimile: (312) 692-1718
Email: adeutsch@EimerStahl.com

Attorneys for Defendant Thumbplay, Inc.

Of Counsel:
PAUL, WEISS, RIFKIND, WHARTON, & GARRISON LLP
Carey R. Ramos
Steven B. Rosenfeld
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 492-0240
Email: cramos@paulweiss.com

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NIKOLAY ANTONOV, individually and on behalf of a calss of similarly situated individuals,<br><br>                Plaintiff,<br><br>        v.<br><br>THUMBPLAY, INC., a Delaware corporation,<br><br>                Defendant. | Case No._____<br><br>Removed from the Circuit Court of Cook County, Case no. 08 CH 26229<br><br>**FILED: AUG. 07, 2008**<br>**08CV4468**<br>**JUDGE NORGLE**<br>**MAGISTRATE JUDGE NOLAN**<br><br>**AEE** |

## NOTICE OF FILING

TO: See Attached Service List

PLEASE TAKE NOTICE that on August 7, 2008, we filed with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division, Defendant Thumbplay Inc.'s Answer, a copy of which is attached hereto.

                                              Respectfully submitted,

                                              /s/ Adam B. Deutsch
                                              Nathan P. Eimer
                                              Adam B. Deutsch
                                              Greg J. Weintraub
                                              EIMER STAHL KLEVORN & SOLBERG LLP
                                              224 S. Michigan Avenue, Suite 1100
                                              Chicago, Illinois 60604
                                              Telephone: (312) 660-7600
                                              Facsimile: (312) 692-1718
                                              Email: adeustch@eimerstahl.com

                                              *Attorneys for Defendant Thumbplay, Inc.*

Of Counsel:
PAUL, WEISS, RIFKIND, WHARTON, &
GARRISON LLP
Carey R. Ramos
Steven B. Rosenfeld
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 492-0240
Email: cramos@paulweiss.com

## CERTIFICATE OF SERVICE

The undersigned certifies that a true copy of the foregoing DEFENDANT THUMBPLAY, INC.'S ANSWER was mailed postage prepaid to all attorneys of record this 7th day of August, 2008.

>Jay Edelson
>Myles McGuire
>Ethan Preston
>Ryan Andrews
>KamberEdelson, LLC
>53 West Jackson Blvd.
>Suite 550
>Chicago, Illinois 60604
>Telephone: (312) 589-6370
>
>*Counsel for Plaintiffs*

                                /s/ Adam B. Deutsch