### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA WALKER, individually, and on behalf of all others similarly situated | ) ) ) | No. 08-CV-4468 |
| Plaintiff, | ) ) ) | Coordinated May 15, 2009 (Dkt. No. 70) with *Kathy Hatfield v. Thumbplay, Inc.*, 09-CV-1559, United States District Court |
| v. | ) ) | for the Northern District of Illinois |
| THUMBPLAY, INC., a Delaware corporation, | ) ) ) | Hon. Charles R. Norgle, Sr. |
| Defendant. | ) ) ) | Magistrate Judge Nan R. Nolan |

### SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff Cynthia Walker brings this class action complaint against Defendant Thumbplay, Inc. seeking to stop Defendant's unlawful practice of charging cellular telephone customers for products and services the customers have not authorized, a practice which has resulted in Defendant unlawfully collecting money from consumers throughout the nation, and to obtain redress for all persons injured by such conduct. Plaintiff, for her second amended class action complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

### PARTIES

1. Plaintiff Cynthia Walker ("Plaintiff" or "Walker") is a natural person and citizen of the State of Illinois.

2. Defendant Thumbplay, Inc. ("Thumbplay" or "Defendant") is a provider of mobile content in the United States. Thumbplay is a corporation organized and existing under the laws of the State of Delaware with its headquarters in New York. Thumbplay does business in this district and throughout the United States.

**JURISDICTION AND VENUE**

3.	This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

4.	This Court is an appropriate venue for the adjudication of this controversy.

**CONDUCT COMPLAINED OF**

5.	This case arises from two closely related phenomena. The first is the capability of most cellular telephones, not only to make and receive telephone calls, but also to send and receive text messages, including – most significantly for present purposes – "premium" text message services. These services, also known as "mobile content," include products that range from the basic (customized ringtones for use with cell phones, sports score reports, weather alerts, stock tips, horoscope services, and the like) to those requiring more advanced capabilities (such as direct payment services, interactive radio, and participatory television).

6.	The second underlying phenomenon of this case constitutes its very core. That is, just as providers of premium mobile content, such as Thumbplay, deliver their products by means of cell phone technology, they likewise charge and collect from their customers by "piggybacking" on the cell phone bills sent out by wireless carriers. Further, because the mobile content providers by themselves most often lack the wherewithal to negotiate the necessary relationships with the much larger wireless carriers, they do so with the help of third-party companies known as billing aggregators. These aggregators act as middle-men, representing numerous mobile content providers in arriving at the agreements that allow them to use the billing and collection mechanisms of the wireless carriers. In turn, both the aggregators and the wireless carriers are compensated for their services by retaining a substantial percentage of the amount received from each transaction.

7. The rapid and largely unplanned growth of the premium mobile content industry has led both to the above-described structure and to a disastrous flaw within it. While that flaw – understood, perpetuated, and even encouraged by carriers, aggregators, content providers such as Thumbplay, affiliate marketers, and major licensors of copyrighted music – is an open secret within the industry, it is little known or understood outside of it. In short, the billing and collection systems established by companies, including Thumbplay, in aid of and to enrich the premium mobile content industry, are conspicuously free of any checks or safeguards to prevent erroneous and unauthorized charges from being added to customers' bills.

8. As Thumbplay also knows, significant amounts of money have been collected in the industry over the last few years on account of such unauthorized charges for premium mobile content. And while it has always been within the power of companies such as Thumbplay to institute simple and effective measures that would prevent this, they have instead knowingly maintained the very system that has allowed these erroneous charges. Indeed, Thumbplay has reaped and retained its share of the improper collections.

9. While the total sales of premium mobile content in 2008 and mid-2009 amount to a significant sum, the business is still in its infancy. The burgeoning industry has already expanded from ordinary ringtones into mass media-related products such as interactive radio and participatory voting at television and concert events and, most recently, into services that enable cell phones to function as credit cards. Unchecked, Thumbplay's billing practices will injure an ever-increasing number of unwitting consumers.

**Thumbplay's Role in the Scheme to Defraud**

10. Unlike transactions made using checks and credit cards, which require a signature or a highly private sixteen-digit credit card number, the only thing a mobile content provider such as Thumbplay needs to charge a consumer for its products and services is the consumer's cellular telephone number. Once a mobile content provider such as Thumbplay gains access to a consumer's cell phone number, it can and does cause that consumer to be billed for services and products irrespective of whether the consumer actually agreed to purchase them.

11. Mobile content providers such as Thumbplay simply provide that cellular phone number, along with an amount to be charged, to a billing aggregator. The aggregator, in turn, instructs the relevant cellular carrier to add the charge to the bill associated with that number. The charge will then appear on the consumer's cell phone bill, often with only minimal, cryptic identifying information. No party to this transaction actually verifies whether the consumer consented to receive or be billed for its mobile content.

12. Because the protections normally present in consumer transactions – such as signatures and private credit card numbers – are absent from this process, the likelihood of false charges increases enormously. And, because a substantial part of mobile content "sales" are affected through websites using misleading, oblique, or inadequately explained "consent" procedures, the likelihood of unauthorized mobile content charges increases by another order of magnitude. Mobile content providers such as Thumbplay have powerful financial incentives to collect as many cell phone numbers as possible, but little incentive to ensure that the owners of those numbers have truly agreed to purchase their goods and services.

13. As it also knows, Thumbplay routinely processes charges for mobile content that have not been authorized by the charged party.

14. As a result, Thumbplay has for years been systematically, repeatedly and without authorization, billing its customers for the purchase of products and services not agreed to by those customers. Thumbplay and its industry partners have, on information and belief, profited significantly through this practice.

15. Thumbplay cooperates with numerous other companies in the scheme to defraud, including aggregators, copyright licensors and affiliate marketers, among others.

**Aggregator's Role in the Scheme to Defraud**

16. In order to tap into the emerging wireless content marketplace and make content services available to wireless consumers, content providers must first obtain access to wireless carriers' mobile communications networks and frequently do so by "partnering" with aggregators – intermediary companies that offer content providers (their "content provider partners") direct access to the carriers through existing relationships. This allows content providers to focus on developing and marketing branded content, applications, and programs, while aggregators manage the complex carrier relationships, distribution, billing, and customer service.

17. Aggregators operate mobile transaction networks that help companies develop, deliver, and bill for mobile content services to compatible mobile devices throughout the State of Illinois and the nation.

18. By using their end-to-end technology platforms, their relationships with U.S. carriers, and other value-added services, these aggregators have forged a crucial link between wireless carriers and mobile content providers. They have enabled the transformation of wireless technology into a marketing, content delivery, and collections process, while carving out a profitable role for themselves as very critical middlemen in this rapidly growing industry.

19. Aggregators have developed a vast distribution system that integrates into the wireless networks of some of the largest wireless carriers nationwide, providing direct connections to hundreds of mobile operators.

20. While aggregators charge their content provider customers some upfront fees, their revenue is primarily generated through a "revenue share" on transactions for which they bill cell phone subscribers: each time a charge is incurred in connection with the purchase of mobile content services, the aggregator and/or the content provider cause said charge to be billed directly on the cellular telephone bill of the carrier's customer who currently owns and/or uses the telephone number (claimed to be) associated with said purchase.

21. The carrier then bills and collects the charge from their current subscriber, retains a portion of the proceeds as their "revenue share," and remits the balance to the aggregator who has direct access to their network and who retains a percentage of the balance in the form of their own "revenue share." The aggregator then remits the remainder directly to the mobile content provider (or, in some instances, to another aggregator who retains a percentage of the balance in the form of their own "revenue share" and remits the balance to their mobile content provider client).

22. Aggregators have in the United States registered numerous transactions and processed significant amounts of money in transactions over recent years and have profited greatly from their arrangement with their industry partners.

**Copyright Licensor's Role in the Scheme to Defraud**

23. Since the advent of customized cellular telephone ringers, the demand for mobile content based on copyrighted music has grown exponentially and today accounts for a significant percentage of all mobile content providers' revenue, including the revenue generated by

5

Thumbplay. In order to tap into such demand, mobile content providers must first obtain permission from the copyright owners of the music that is to be sold in the form of ringtones.

24. Owners of copyrighted music, such as Universal Music Group, Inc., among many others, have licensed portions of their libraries of copyrighted music to numerous mobile content providers including Thumbplay, for the latter to sell to consumers in the form of ringtones. This arrangement allows Thumbplay to focus on developing and marketing content, applications and programs based on the copyrighted music while allowing the copyright owners to remain silent partners operating primarily in the background.

25. While copyright owners are ordinarily compensated by their content provider partners such as Thumbplay through upfront fees, their revenue is frequently generated through a "revenue share" or "equity share" based on mobile content transactions involving their copyrighted material: each time a charge is incurred in connection with the purchase of their copyrighted mobile content, the content provider causes that charge to be billed directly on the cellular telephone bill of the carrier's customer who currently owns and/or uses the telephone number (claimed to be) associated with said purchase.

26. Licensors have, in Illinois and throughout the nation, registered numerous transactions and processed significant amounts of money over recent years, profiting greatly from their arrangements with their industry partners.

27. Licensors have not only sanctioned unfair and unlawful billing practices, they have actively promoted it by negotiating and facilitating partnerships between themselves and mobile-content providers such as Thumbplay, and by failing to maintain adequate safeguards to prevent unauthorized charges. Despite their knowledge of such illegal practices and lack of

reliable safeguards, licensors continue to collect revenue for the sale of unauthorized mobile content.

## Affiliate Marketer's Role in the Scheme to Defraud

28. Affiliate marketers are Internet advertising networks that provide a distribution platform for mobile content providers' products and services.

29. Advertising is an essential step in the mobile content ecosystem. Without the ability to drive users to their websites, mobile content providers such as Thumbplay would be unable to earn virtually any revenue, no matter how misleading or fraudulent their services. Absent advertising through these so-called affiliate marketers, the fraudulent mobile content providers would have significantly fewer visitors to their websites and their illegal revenues would drop dramatically.

30. Many affiliate marketers with whom mobile content providers contract, including on information and belief Thumbplay, fail to clearly and accurately disclose a host of highly relevant information to consumers about purchasing mobile content, such as the service's price, subscription period and cancellation procedures, among others.

31. Indeed, many affiliate marketers, at the express direction of content providers such as Thumbplay, intentionally employ anti-consumer practices simply to achieve the next "sale," including so-called "negative options" which involves the practice of presenting a consumer with an opportunity to consent in advance to continue to receive products or services in the future until cancelled. In such situations the seller frequently interprets the consumer's silence or failure to take an affirmative action to reject goods or services, or to cancel the sales agreement, as an agreement to continue to receive the offer, when in fact the consumer intends just the opposite. Moreover, one of the mobile content industry's largest affiliate marketers,

Epic Advertising, Inc. f/k/a Azoogleads US, Inc. ("Azoogle"), recently settled claims brought against it by the Office of the Attorney General of the State of Florida for deceptively marketing mobile content through a negative option rubric.

32. Defendant Thumbplay knows affiliate marketers are loathe to adequately disclose the relevant information about purchasing mobile content for fear of scaring off potential customers. However, Thumbplay has intentionally and systematically declined to require those with whom it contracts to obtain consumers' true advance consent before causing such consumers to be billed.

33. Indeed, if Defendant wanted to end this illegal billing, it could do so in an instant. All it would have to do to ensure that it is obtaining the consent of the charged party is agree to process a unique "access code" for each customer account, provided by the carrier to the account holder and his/her authorized representative at the time it is opened, and require that it be produced anytime a third-party attempts to charge the account. If a matching access code is not provided, no charges would be included on the customer's billing statement.

34. But, instead of implementing such a simple safeguard, Thumbplay has intentionally created, maintained and promoted a system that encourages fraud at every step.

35. Defendant's conduct is by no means accidental. As previously alleged, Thumbplay knows that many of its cellular telephone customers dispute that they consented to be charged for Thumbplay's mobile content services. Thumbplay further knows that it cannot authenticate such customer's consent to be billed for its mobile content. In light of its knowledge of these facts, Thumbplay's decision to continue to charge its customers for mobile content without taking steps to authenticate their consent constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.

36. Because the amount Thumbplay is taking is small on an individual basis – as little as a few dollars to at most several hundreds of dollars per person – Thumbplay employs this scheme with the hope and expectation that its illegal conduct will go unpunished.

## THE FACTS RELATING TO THE NAMED PLAINTIFF

37. In or about January 2006, Walker purchased new cell phone service from an authorized representative of wireless carrier Verizon Wireless.

38. On that same day, in exchange for a cellular telephone service plan and her carrier's promise to provide various communication and related services to Walker and to bill her only for products or services the purchase of which were authorized, Walker agreed to pay her wireless carrier a set monthly fee for a period of approximately 12 months.

39. In or around November 2007, and then again in December 2007, Thumbplay caused Walker's cell phone account to be charged for mobile content services that she neither wanted nor authorized.

40. At no time did Plaintiff authorize the purchase of these products and services offered by Thumbplay, nor did Plaintiff consent to the receipt of text messages to her cellular telephone.

41. At no time did Plaintiff authorize Thumbplay or anyone else to bill her for Thumbplay's products and services.

42. Thumbplay has yet to provide Plaintiff a full refund of the unauthorized charges (i.e. premium text message charges, ordinary text messages, data charges, back interest), nor an assurance that such unauthorized charges would not appear in future billing periods.

## CLASS ALLEGATIONS

43. Plaintiff brings this action on behalf of herself and a Class and Subclass, defined as follows:

(a) a class ("the Class") consisting of all wireless telephone subscribers in the nation who suffered losses or damages as a result of Thumbplay billing for mobile content products and services not authorized by the subscriber; provided, however, that the following are excluded from this proposed Class: (i) the Defendant, and (ii) any employee of Defendant; and

(b) a subclass (the "Subclass") consisting of all Illinois resident members of the Class, provided, however, that the following are excluded from this proposed Class: (i) the Defendant, and (ii) any employee of Defendant.

44. Plaintiff's claims are typical of the claims of the other Class and Subclass members.

45. Plaintiff will fairly and adequately represent and protect the interests of the other Class and Subclass members. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other Class and Subclass members, and have the financial resources to do so. Neither Plaintiff, nor her counsel, have any interest adverse to those of the other Class and Subclass members.

46. Absent a class action, most members of the Class and Subclass would find the cost of litigating their claims to be prohibitive, and would have no effective remedy. Class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the Judiciary and the litigants, and promotes consistency and efficiency of adjudication.

47. Defendant has acted and failed to act on grounds generally applicable to Plaintiff and the other Class and Subclass members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the other Class and Subclass members.

48. The factual and legal bases of Defendant's liability to Plaintiff and the other Class and Subclass members are the same, resulting in injury to Plaintiff and to the other Class and Subclass members. Plaintiff and the other Class and Subclass members have all suffered harm and damages as a result of Defendant's unlawful and wrongful conduct.

49. There are many questions of law and fact common to the claims of Plaintiff and the other Class and Subclass members, and those questions predominate over any questions that may affect individual Class and Subclass members. Common questions for the Class include but are not limited to the following:

    (a) Whether Thumbplay has been unjustly enriched as a result of the conduct described herein.

    (b) Whether Thumbplay's conduct described herein constitutes tortious interference with a contract.

    (c) Whether Thumbplay's conduct described herein constitutes trespass to chattels.

50. Common questions for the Subclass include but are not limited to the following:

    (a) Whether Thumbplay's conduct described herein constitutes consumer fraud.

**COUNT I**
**(Restitution/Unjust Enrichment on behalf of the Class)**

51. Plaintiff incorporates by reference the foregoing allegations.

52.     Plaintiff and the other members of the Class have conferred a benefit upon Thumbplay to their detriment.

53.     Thumbplay has received and retained money belonging to Plaintiff and the other members of the Class as a result of billing for and collecting unauthorized mobile content charges.

54.     Thumbplay appreciates or has knowledge of said benefit.

55.     Under principles of equity and good conscience, Thumbplay should not be permitted to retain the money belonging to Plaintiff and the other members of the Class which Thumbplay has unjustly received as a result of its actions.

## COUNT II
### (Tortious Interference with a Contract on behalf of the Class)

56.     Plaintiff incorporates by reference the foregoing allegations.

57.     Plaintiff and the other members of the Class had valid and enforceable contracts with their respective wireless carriers whereby they agreed to pay a certain sum of money in exchange for activation of their cellular telephone accounts and their carriers' promise to provide various communication and related services to Plaintiff and the other members of the Class and to bill Plaintiff and the other members of the Class only for products or services the purchase of which they authorized.

58.     Thumbplay knew of said contractual relationships and intended to and did induce a breach or disruption of the contractual relationships.

59.     Thumbplay intentionally interfered with said contractual relationships through improper motives and/or means by knowingly and/or recklessly continually causing

unauthorized mobile content charges to be placed on the cellular telephone bills of cellular telephone owners across the nation.

60. As a direct and proximate result of Thumbplay's conduct, Plaintiff and the other members of the Class suffered damages.

## COUNT III
### (Trespass to Chattels on behalf of the Class)

61. Plaintiff incorporates by reference the foregoing allegations.

62. Defendant and/or its agents, intentionally and without consent, transmitted mobile content to Plaintiff's cellular phone and the wireless devices of the other members of the Class.

63. In the course of transmitting mobile content to these wireless devices, Thumbplay and/or its agents intentionally and without consent, gained access to these devices, used these devices, occupied the memory of these devices, and/or dispossessed Plaintiff and the members of the Class of unencumbered access to their wireless devices.

64. Plaintiff owns the cellular phone at issue. Likewise, the other members of the Class own, possess, and use the wireless devices to which Thumbplay transmitted or caused to be transmitted mobile content. These wireless devices are the personal property of Plaintiff and the other members of the Class.

65. By transmitting unauthorized mobile content to the cell phone of Plaintiff and the wireless devices of the other members of the Class, Thumbplay intentionally intermeddled with, damaged, and deprived Plaintiff and the other members of the Class of their wireless handsets, or a portion thereof.

66. As a direct and proximate result of Thumbplay's conduct, Plaintiff and the other members of the class suffered damages, including but not limited to, the unauthorized charges

13

for mobile content which Thumbplay obliged Plaintiff and the other members of the Class to pay.

## COUNT IV
### (Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act on Behalf of the Subclass)

67. Plaintiff incorporates by reference the foregoing allegations.

68. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA") declares unlawful "any [u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."

69. Thumbplay violated, and continues to violate this proscription through its conduct alleged above.

70. Thumbplay, through its acts of unfair competition, has obtained money from Plaintiff and other members of the Subclass. Plaintiff and the members of the Subclass request that the Court restore that money to Plaintiff and the other members of the Subclass and enjoin Thumbplay from continuing its illegal practices.

71. Such conduct is ongoing and continues to this date. Plaintiff, the other members of the Subclass, and the general public are therefore entitled to the relief described herein.

WHEREFORE, Plaintiff Cynthia Walker, on behalf of herself and the Class and Subclass, prays for the following relief:

    a. Certify this case as a class action on behalf of the Class and Subclass as defined above and appoint Cynthia Walker Class Representative, and appoint the undersigned as lead counsel;

    b.    Declare that the actions of Thumbplay, as set out above, constitute unjust enrichment, tortious interference with a contract, and trespass to chattels;

    c.    Enter judgment against Thumbplay for all economic, monetary, actual, consequential, and compensatory damages caused by its conduct;

    d.    Award Plaintiff and the Class and Subclass reasonable costs and attorneys' fees;

    e.    Award Plaintiff and the Class and Subclass pre- and post-judgment interest;

    f.    Enter judgment for injunctive, statutory, and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class and Subclass;

    g.    Declare that the actions of Thumbplay, as set forth above, as well as in other respects, constitute a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act on behalf of the Subclass; and

    h.    Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: August 6, 2009

Respectfully submitted,

**CYNTHIA WALKER**, individually and on behalf of all others similarly situated

By: /s/ Rafey S. Balabanian
        One of Her Attorneys

Jay Edelson (ARDC No. 6239287)
Email: jedelson@kamberedelson.com
Rafey S. Balabanian (ARDC No. 6285687)
Email: rbalabanian@kamberedelson.com
KAMBEREDELSON, LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378